# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO: 22-CR-179 (JMC)** |
| **v.** | : | |
| | : | |
| **LEON LIPSCOMBE,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Leon Lipscombe to a Guidelines sentence of 151 months' incarceration, followed by 10 years' supervised release.

## I.    Factual and Procedural Background

This case stems from a tip that the FBI received, suggesting that the Defendant was in a social media group devoted to the exchange of child pornography. Presentence Investigation Report ("PSR") ¶ 9. As a result of that tip, an undercover District of Columbia MPD Task Force officer with the FBI (UC), posing as the father of a nine-year-old boy, monitored the Defendant's public social media accounts and reached out to the Defendant in March of 2021 via the Internet. *Id.* ¶ 10. The UC told the Defendant that he was an "open minded freaky dad." *Id.* The Defendant asked the UC what he was into sexually, and the UC stated, "no limits really," to which the Defendant responded, "I like the sound of that." *Id.* The UC and the Defendant began communicating on KIK, and the Defendant told the UC that his favorite age was "0-5." *Id.* The

Defendant asked the UC about his purported son, wondering "what have you done with him and do u still mess around?" *Id.*

In April 2021, the UC asked the Defendant if he had a Telegram account, and the UC subsequently asked the Defendant if he could send him "stuff." *Id.* ¶ 11. Within a minute, the Defendant reached out to the UC via Telegram and sent the UC a video depicting an adult male anally raping a small child. *Id.* When the UC asked the Defendant how old the child was, the Defendant responded that he believed the child was between five and six years old. *Id*. That same day, the Defendant sent an additional four videos depicting adult males raping prepubescent boys. *Id.*

On April 13, 2021, the UC asked the Defendant, "how'd you get into this?" The Defendant responded that he went on "Tumblr, just faking down rabbit holes," but added that he "messed with his cousin when I was little and my lil bro when I was 13 and he was 6." *Id.* ¶ 12. The Defendant later asked the UC, "so what normally happens with u and your son when he's over? Do y'all mess around at random when one of you is interested? Like what's a normal visit like." *Id.* The UC told the Defendant that his kid engaged in "normal kid stuff," but that the UC also sexually abused the child while he slept. *Id.* The Defendant replied, "U know I love hearing all this," and "I'd let him play the PS5 and just eat his ass all day tbh." *Id.* The UC said his fantasy was to have someone "play" with his son. *Id.* The Defendant responded, "Wow, if I ever get the chance to enjoy him I'd be honored man. But no rush and that's totally your call. But yeah, I want him on his stomach and I come behind, kiss his neck and body til I slowly let his little Ass out of his underwear and eat his ass. Also Wanna suck his peepee. Watch him squirm and feel good from my mouth." *Id.*

On May 21, 2021, FBI and MPD executed a search warrant at the Defendant's residence in Washington, D.C. *Id.* ¶ 13. The Defendant was present at the residence, where he appeared to live alone. *Id.* The Defendant admitted that he communicated with the UC online and acknowledged that he had sent the UC between five and seven sexually explicit videos of children. *Id.* The Defendant also acknowledged that he spoke to other like-minded pedophiles online and admitted he had between 100 and 5,000 child pornography videos and images on his electronic devices. *Id.* The Defendant further admitted that he had sexual contact with minors in the past; specifically, he believed he had engaged in sexual acts with a 17-year-old at Howard University in 2019 (when the Defendant was approximately 25-years-old) and that he and his cousin had engaged in sexual acts when they were both minors.[1] *Id.*

During the execution of the search warrant at his home, the Defendant's electronic devices were recovered and were subsequently forensically examined. *Id.* ¶ 14. The forensic examination recovered over 600 videos and 1,000 images depicting child pornography. *Id.* These videos and images were distributed or received between the dates of March and May 19, 2021. *Id.* Other chat conversations in which the Defendant distributed child pornography were also recovered, to include a lengthy chat with an individual who discussed his desire to "babysit" children so he could gain access to them. *Id.* In that particular conversation, the Defendant acknowledged that he had "felt" a little girl and wanted to "do" her but claimed he did not have time. *Id.* The Defendant said that he had "felt on her pussy lips, shit was fat and warm." *Id.* The Defendant and this other individual planned to meet up so that they could have sex and also "perv" together. *Id.* They sent each other numerous videos and photographs, and the Defendant distributed additional child

---

[1] The Defendant is currently 28 years old, suggesting that his sexual interest in minors has been an issue for many years.

pornography. *Id.* This conversation continued until the day before the search warrant execution and seizure of the defendant's devices. *Id.*

The Defendant pled guilty to one count of Distribution of Child Pornography on January 12, 2023. *Id.* ¶ 4. The government now files this Sentencing Memorandum, and respectfully requests that the Court impose a Guidelines sentence of 151 months, to be followed by 10 years' supervised release.

## II.     The Sentencing Guidelines and Guidelines Analysis

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in *Blakely v. Washington*, 542 U.S. 961 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, 18 U.S.C. § 3553(b)(1). *Booker*, 543 U.S. at 244.

In post-*Booker* cases, the Supreme Court has instructed that a district court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."). After giving both parties an opportunity to argue for an appropriate sentence, the district court should then consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). *Id.* These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the kinds of sentences available (18

4

U.S.C. § 3553(a)(3)); the Sentencing Guidelines and related Sentencing Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); the need to avoid unwarranted sentencing disparities (18 U.S.C. § 3553(a)(6)); and the need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7)).

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated the Defendant's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2G2.2(a)(2)) | 22 |
| Specific Offense Characteristics | |
| Depictions of minors under 12 (U.S.S.G. §2G2.2(b)(2)) | +2 |
| Knowingly engaged in distribution (U.S.S.G. §2G2.2(b)(3)(F)) | +2 |
| Sadistic or masochistic conduct or other depictions of violence or Sexual abure or exploitation of a toddler (U.S.S.G. §2G2.2(b)(4)) | +4 |
| Use of a computer (U.S.S.G. §2G2.2(b)(6)) | +2 |
| Involved 600+ images U.S.S.G. §2G2.2(b)(7)(D) | +5 |
| | |
| Acceptance of responsibility U.S.S.G. §3E1.1(a) & 3E1.1(b) | -3 |
| | |
| Total Adjusted Offense Level | 34 |

*See* PSR at ¶¶ 22-31.

The U.S. Probation Office calculated the Defendant's criminal history as a Category I, which is not disputed. *Id.* at ¶ 34. Accordingly, the U.S. Probation Office calculated the Defendant's total adjusted offense level at 34, and his corresponding Guidelines imprisonment range at 151 to 188 months. *Id.* at ¶ 67.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and

adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying

with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96

(2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its

determinations on empirical data and national experience, guided by professional staff with

appropriate expertise,'" and "to formulate and constantly refine national sentencing standards."

*Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the

Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States
> Sentencing Commission's in-depth research into prior sentences,
> presentence investigations, probation and parole office statistics,
> and other data. U.S.S.G. §1A1.1, intro, comment 3. More
> importantly, the Guidelines reflect Congress's determination of
> potential punishments, as set forth in statutes, and Congress's
> on-going approval of Guidelines sentencing, through oversight of
> the Guidelines revision process. *See* 28 U.S.C. § 994(p) (providing
> for Congressional oversight of amendments to the Guidelines).
> Because the Guidelines reflect the collected wisdom of various
> institutions, they deserve careful consideration in each case.
> Because they have been produced at Congress's direction, they
> cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both*

determine that the Guidelines sentence is an appropriate sentence for the case at hand, that sentence

likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and

that *significantly* increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at

347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing

range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'"

*Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide a helpful benchmark, and remain a necessary factor for the Court's consideration.

### III.    A Guidelines Sentence Accurately Reflects the 18 U.S.C. § 3553(a) Factors

In determining a reasonable sentence, the Court must consider the factors listed in 18 U.S.C. § 3553(a).[2]  These factors include:

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    the need for the sentence imposed –

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and

(3)    the kinds of sentences available;

(4)    the applicable sentencing guidelines range for the offense;

(5)    pertinent policy statements issued by the U.S. Sentencing Commission;

(6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)    the need to provide restitution to any victims of the offense.

---

[7] Since the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the Guidelines serve only an advisory function. *Id.* at 245. Nevertheless, even in a post-*Booker* world in which the Guidelines are not binding, the sentencing court 'must calculate and consider the applicable Guidelines range" as its starting point. *Booker* did not change "how the Guidelines range is to be calculated." *United States v. Mattea*, 895 F.3d 762, 766 (D.C. Cir. 2018) (internal citations and quotations omitted).

18 U.S.C. § 3553(a). A district court, however, "need not consider every § 3553(a) factor in every case." *In re Sealed Case*, 527 F.3d 188, 191 (D.C. Cir. 2008); *see also United States v. Fry*, 851 F.3d 1329, 1332 (D.C. Cir. 2017).

### A.  The Nature and Circumstances of the Offense

The Defendant's conduct in this case is extremely serious. The Defendant not only distributed child pornography to the UC in this case, but also distributed to other likeminded individuals. The Defendant further acknowledged that his preferred age range is "0-5," and admitted that his sexual preference went beyond mere fantasy. Indeed, the Defendant admitted that he had sexually abused minors in the past. The Defendant shared numerous videos depicting the sexual abuse of prepubescent boys, and the Defendant discussed the molestation of a young girl with another individual with whom he was sharing child pornography with up until the day before his electronic devices were seized.

The Defendant's offenses have been perpetrated against the most vulnerable members of our society – children. Children captured in images and videos depicting their sexual abuse are traumatized and victimized in the worst way imaginable at the time the images were created, and they are re-victimized and re-traumatized each and every time an individual views the images for their own sexual gratification. As eloquently explained by the Sixth Circuit in a child pornography case:

> . . . we have numerous victims in a case like this, not one victim. Every image of a child, every image of a non-adult engaged in any type of sexual activity or any type of pose without clothing or any type of exploitation constitutes an additional case of victimizing a child. Without a demand for that type of information and that type of viewing from persons like this defendant, we don't know how many child abuse cases we could prevent. And as long as there is a demand to purchase images of child pornography, there is going to be an unending stream of child abuse of . . . children who are forced into these roles.

8

> . . . every image has a child who has been exploited and abused, and that is the
> concern I have. It is the concern that I have when people are engaged in serially
> doing this, the effect it has on children throughout the world and the effect it has on
> their future lives.

See United States v. Miller, 665 F.3d 114, 121-22 (6th Cir. 2011) (quoting the district court)

(rejecting an attack on the child pornography sentencing guidelines and highlighting the grave

harm caused to the victims depicted in child pornography images and the evidence that traffickers

and possessors of child pornography are the impetus for the creation of more sexual abuse of

minors).

Each one of the images and videos the Defendant distributed and discussed represents an

innocent child victim who had the worst moments of their lives forever memorialized and spread

to countless offenders all over the world via the internet. See Blinkinsop, 606 F.3d 1110, 1118 (9th

Cir. 2010) (finding that "[t]he children involved in pictorial and cinematic pornography

additionally endure ongoing harm because their images have been preserved in a permanent

medium"). In New York v. Ferber, the U.S. Supreme Court noted:

> [P]ornography poses an even greater threat to the child victim than does sexual
> abuse or prostitution.  Because the child's actions are reduced to a recording, the
> pornography may haunt him in future years, long after the original misdeed took
> place.  A child who has posed for a camera must go through life knowing that the
> recording is circulating within the mass distribution system for child pornography.

458 U.S. 747, 759 n.10 (1982), quoting Shouvlin, Preventing the Sexual Exploitation of

Children: A Model Act, 17 Wake Forest L.Rev. 535, 545 (1981).

The Defendant's persistent sexual interest in very young children and his distribution of

child pornography is extremely serious and dangerous. The conduct that brings the Defendant

before the Court was not a one-time occurrence, nor a mistake. The Defendant intentionally

discussed, shared, and possessed child pornography. This is not a case where the Defendant only

distributed a few images containing child pornography; rather, this Defendant communicated with other like-minded pedophiles for several months, and acknowledged that his sexual interest in minors goes back many years, since his childhood. Given the extremely serious nature of the Defendant's criminal conduct, a Guidelines sentence is appropriate.

### B.  The History and Characteristics of the Defendant

The Defendant's lack of criminal history does not accurately reflect his history and characteristics given the nature of the offense in this matter. The Defendant admitted he has had a sexual interest in children for a length period of time. The Defendant was only caught by law enforcement when an undercover law enforcement officer, posing as a like-minded pedophile with access to a young boy, was able to contact the Defendant to engage in what the Defendant believed to be a private conversation. Of course, the Defendant went on to distribute several videos depicting the sexual abuse of very young boys. Further, the Defendant has admitted to having an sexual interest in children for a lengthy time-period – going back to his own childhood – before he was detected by law enforcement. The Defendant was savvy enough to use encrypted applications to share child pornography and saved numerous images and videos to his own devices. Thus, the Defendant's lack of a criminal record does not reflect his true character. The lack of criminal history *only* reflects the Defendant's sneaky and successful ability to evade law enforcement detection, not an absence of criminal intent or criminal conduct.

The circumstances of the instant offense, the protracted time frame over which his criminal conduct occurred, as well as the fact that the Defendant possessed numerous child pornography images and videos on his devices at the time of his arrest demonstrate the need for a Guidelines sentence to appropriately address his criminal conduct.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The sexual exploitation of children, including online discussions about abuse, as well as the downloading, distributing, viewing and possession of child sexual abuse material, has devastating consequences for the children depicted in these images and videos. Once they find their way onto the Internet, images and videos depicting the sexual abuse of a child will circulate in perpetuity because individuals make the repetitive and purposeful decision to collect, save, and trade such images and videos for their own sexual gratification.

Furthermore, consumers and distributers of child pornography, like the Defendant, create a market and demand for the production of these images and videos, which depict the sexual abuse and exploitation of real children. These consumers and distributers contribute to the cycle of abuse and are in part responsible for the harm suffered by children used to produce the images and videos in their collections. *See United States v. Goff,* 501 F.3d 250, 259-60 (3d Cir. 2007) ("Children are exploited, molested, and raped for the prurient pleasure of [defendant] and others who support suppliers of child pornography"); *see also United States v. Accardi*, 669 F.3d at 345 (D.C. Cir. 2012) (emphasizing that "child pornography creates an indelible record of the children's participation in a traumatizing activity, and the harm to the child is only exacerbated by the circulation of the materials.") In *United States v. Goldberg,* the Seventh Circuit stated:

> The district judge was influenced by the erroneous belief that a sentence affects only the life of the criminal and not the lives of his victims.  Young children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded-both consumed himself and disseminated to others.  The greater the customer demand for child pornography, the more that will be produced. [Citations omitted].

491 F.3d 668, 672 (7th Cir. 2007).

When enacting mandatory minimum penalties for those who produce and traffic in the sexual abuse and exploitation of children, Congress similarly described the evil of child pornography:

> [W]here children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years . . . [The] existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children . . . it inflames the desires of . . . pedophiles . . . who prey on children, thereby increasing the creation of and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials.

Child Pornography Prevention Act of 1996, Pub.L. No. 104-208, § 121, 110 Stat. 3009, 3009-27 (1996). There is perhaps no greater invasion of privacy than that caused by the dissemination of child pornography. With a click of the button on a camera, the sexual abuse of these children is memorialized forever. It is terrible enough that a child must live with the memory of his or her initial abuse. It is hard to even comprehend how that child could then learn to cope with the fact that strangers everywhere are using the worst moments of that child's life to sexually gratify themselves and that he or she can do nothing to stop them from continuing to do so. The only recourse that these children have is the strong enforcement of the laws that hold these offenders accountable for the tremendous damage they have inflicted upon countless child victims.

The Defendant distributed materials depicting the sexual abuse and exploitation of real and very young children. The Court need only review the Victim Impact Statements from the victims in the images and videos he possessed to understand the devastating effect that the production and dissemination of those videos actually has had on real child victims. Therefore, with respect to 18

U.S.C. § 3553(a)(2)(A), a Guidelines sentence accounts for the seriousness of the Defendant's conduct.

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence with respect to child pornography offenses is of particular importance for three reasons. First, serious penalties for child pornography offenders decrease the number of participants in the market, which in turn decreases the need for its production.

> The greater the customer demand for child pornography, the more that will be produced.  Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor.  The logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so more will be produced.

*Goldberg*, 491 F.3d at 672.

Second, both Congress and the courts have recognized the high recidivism rates for these types of offenders. *See* Blaisdell, Krista, Note, *Protecting the Playgrounds of the Twenty-First Century: Analyzing Computer and Internet Restrictions for Internet Sex Offenders*, 43 Val.U.L. Rev. 1155, 1192, n.150 (2009) (compiling congressional statements regarding the high risk of recidivism among child sex offenders); *Accardi*, 669 F.3d at 346 (noting that "a number of circuits have upheld [sentences] . . . for defendants convicted of possession of child pornography based on the same general concerns about recidivism") (citing *United States v. Cope*, 527 F.3d 944, 952 (9th Cir. 2008) (noting that, there, the "sentence [was based] on general concerns about recidivism and protection of the public."))); *United States v. Pugh*, 515 F.3d 1179, 1201 (11th Cir. 2008); *United States v. Allison*, 447 F.3d 402, 405-06 (5th Cir. 2006); *United States v. Garthus*, 552 F.3d 715, 720 (7th Cir. 2011) ("We need evidence-driven law just as we need evidence-driven medicine

. . . statistical analysis of sex crimes has shown that the best predictor of recidivism is not deportment at an interview but sexual interest in children") (citations omitted)).

Third, there is an undeniable link between sexual contact offenses and the receipt and distribution of child pornography. "An offender's pornography and erotica collection is the single best indicator of what he wants to do." *See* Lanning, Kenneth V., *Child Molesters: A Behavioral Analysis – For Professionals Investigating the Sexual Exploitation of Children*, Office of Juvenile Justice and Delinquency Prevention, Fifth Ed. 2010, at 107.

Each of these factors is important in this case. The Defendant has admitted that his sexual preference was not mere fantasy. The Defendant acknowledged that he has had sexual contact with minors in the past, and the Defendant was discussing the sexual abuse of a young girl until May 2021, when his electronic devices were seized by law enforcement. The link between the Defendant's distribution of child pornography and actual hands-on abuse is clear in this case and warrants a Guidelines sentence. Imposing a lengthy sentence of incarceration for the Defendant is important to deter him and like-minded criminals from continuing to sexually exploit and abuse young and vulnerable victims.

### E.  The Need to Avoid Unwarranted Sentence Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

Section 3553(a)(6) directs courts to consider avoiding *unwarranted* disparities among defendants "with similar records who have been found guilty of similar conduct." It "does not require the district court to avoid sentencing disparities between defendants who might not be similarly situated." *United States v. Mattea*, 895 F.3d 762, 768 (D.C. Cir. 2018) (quoting *United States v. Guillermo Balleza*, 613 F.3d 432, 435 (5th Cir. 2010).

While it is true that other offenders sentenced in this District on charges related to the distribution of child pornography have received sentences below the Guidelines sentence that the Government is requesting, imposing a Guidelines sentence of 151 months' in this case would not create an unwarranted disparity. This case is easily distinguishable from the vast majority of other distribution cases, which typically involve distributions only to undercover law enforcement officers, or distribution charged to a very narrow time period of 1-2 days. The Defendant distributed multiple videos to the UC in this case and acknowledged that his preferred age range targeted *extremely* young and vulnerable victims (0-5 years old). The Defendant was conversing with other like-minded pedophiles via the Internet and was discussing the actual abuse of a young girl up until his electronic devices were seized. Further, the Defendant admitted to having sexual contact with a minor when he was adult and further admitted that he had sexual contact with a family member when he was a minor himself (the Defendant is currently 28-years-old).

It should also be noted that, in calculating the defendant's Guidelines range, the defendant does not receive any "points" for his behavior and conduct that the Sentencing Commission deems to be "aggravating factors." *See* Federal Sentencing of Child Pornography Non-Production Offenses (https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf) (noting additional factors that a Court may consider at sentencing when determining the level of danger a particular offender poses to the community). Beyond considering the factors accounted for in the Sentencing Guidelines calculation, "[t]he Commission recommended that three primary factors be [additionally] considered when imposing sentences in non-production child pornography cases: (1) the content of the offender's child pornography collection and nature of the offender's collecting behavior; (2) the offender's degree of involvement with other offenders, particularly in an internet community

15

devoted to child pornography and child sexual exploitation; and (3) the offender's engagement in sexually abusive or exploitative conduct in addition to the child pornography offense." *Id.* As explained above, this defendant collected hundreds of images and videos depicting child pornography. His collection was extensive. This defendant did not receive any Guidelines enhancements or points for engaging in this criminal conduct for a lengthy time-period, nor did her receive any additional "points" for actively engaging in an online community and conversing with other like-minded pedophiles. Indeed, the defendant was familiar with various applications, including Telegram. He savvily and sneakily chose to use that encrypted application, known to help its users evade law enforcement, to distribute child pornography to the UC in this case. The defendant was engaged in other conversations with other pedophiles, including an individual he planned to meet up with after discussing the sexual abuse of a young girl. Finally, no "points," nor enhancements, apply for this defendant's sexual contact with minors, including two minors he admitted having sexual contact with in the past, and the young girl he discussed molesting shortly before his arrest in this case.

As such, this defendant engaged in even worse conduct than what Guideline §2G2.2 considers and attempts to address. These factors noted by the Commission ought to be considered when fashioning a sentence for this defendant.

When an offense is uniquely serious, courts will consider the need to impose "stiffer sentences" that "justif[y] the risk of potential disparities." *United States v. Jones*, 846 F.3d 366, 372 (D.C. Cir. 2017); *see also Accardi*, 669 F.3d at 346 (concluding that a within-Guidelines sentence for a child-pornography offense did not produce an unwarranted disparity when the images distributed by the defendant "were much more aggressive and troubling than the images distributed by other offenders" who received lesser sentences. Given all of these factors, a sentence

as the Government is recommending avoids creating an unwarranted sentencing disparity between defendants with similar records who have been convicted for similar conduct.

**IV.     The Victims are Entitled to Restitution**

Prior to December 7, 2018, Title 18 U.S.C. § 2259 directed that, "notwithstanding section 3663 or 3663A, and in addition to any other civil or criminal penalty authorized by law, the court shall order restitution for any offenses under this chapter." 18 U.S.C. § 2259(a); *United States v. Hite*, 113 F. Supp. 3d 91, 94 (D.D.C. 2015) ("Pursuant to 18 U.S.C. § 2259, the victims of certain federal crimes, including possession of child pornography, are entitled to mandatory restitution."). Restitution was defined to include "the full amount of the victim's losses," which includes any costs incurred by the victim for:

> (A) Medical services relating to physical, psychiatric, or psychological care;
>
> (B) Physical and occupational therapy or rehabilitation;
>
> (C) Necessary transportation, temporary housing, and child care expenses;
>
> (D) Lost income;
>
> (E) Attorneys' fees, as well as other costs incurred; and
>
> (F) Any other losses suffered by the victim as a proximate result of the offense.

18 U.S.C. § 2259(b)(3); *see also United States v. Hite*, 113 F. Supp. 3d 91, 94 (D.D.C. 2015). The Court may not decline to issue an order under this section because of the economic circumstances of the defendant. 18 U.S.C. § 2259(B)(i).

In *Paroline v. United States*, 572 U.S. 434 (2014), the United States Supreme Court faced a circuit split over the interpretation of 18 U.S.C. § 2259, specifically over "how to determine the amount of restitution a possessor of child pornography must pay to the victim whose childhood abuse appears in the pornographic materials possessed." *Paroline*, 572 U.S. at 439. In *Paroline*,

17

the defendant possessed two images of the victim who was seeking restitution. The Court's answer to this question involved three steps. First, *Paroline* held that, because the statute defined a "victim" as someone "harmed as a result" of the offense, restitution under § 2259 was proper "only to the extent the defendant's offense proximately caused a victim's losses." *Id*. at 448. Second, the Court held that "proximate cause" under § 2259 did not require strict but-for causation. *Id*. at 457-59. Recognizing that under the circumstances of most child pornography possession cases – where losses resulted from harm caused by the trafficking of a victim's images by numerous "geographically and temporally distant offenders acting independently, and with whom the defendant had no contact," *id*. at 455, - the Court held:

> In this special context, where it can be shown that a defendant possessed a victim's images and that a victim had outstanding losses caused by the continuing traffic in those images but where it is impossible to trace a particular amount of those losses to the individual defendant by recourse to a more traditional causal inquiry, a court applying § 2259 should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses.

*Id*. at 458. The Court made clear that, where the victim's losses are "the product of the acts of thousands of offenders," a restitution order should not be "too severe" but must not be merely "a token or nominal amount." *Id.* at 459. That is, in part, because a restitution order under § 2259 serves "twin goals," the first being to "help[] the victim achieve eventual restitution for all her child-pornography losses" and second to "impress[] upon offenders the fact that child pornography crimes, even simple possession, affect real victims." *Id.* Third, the Court provided sentencing courts the following guidance for how to determine the proper amount of restitution under this standard. *Id*. The Court noted that a sentencing court's goal should be to assess "the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses," taking into account any "available evidence." *Id*. The Court emphasized that there

18

is no "precise mathematical inquiry" governing this determination and that district courts must exercise "discretion and sound judgment" in fashioning restitution awards. *Id.*

The Court suggested several factors to be considered, including: (1) the number of defendants convicted of possessing the victim's images; (2) the number of future offenders likely to be caught and convicted; (3) whether the defendant had any role in the initial production of the images; (4) whether the defendant reproduced or distributed the images; (5) how many images the defendant possessed; and (6) "other facts relevant to the defendant's relative causal role." *Id.* "These factors need not be converted into a rigid formula, especially if doing so would result in trivial restitution orders. They should rather serve as rough guideposts for determining an amount that fits the offense." *Id.* at 460.

Congress has since amended Section 2259 to both codify *Paroline*'s basic approach and to set a restitution floor of $3,000.00. *See* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299, 132 Stat. 4383 (December 7, 2018). As detailed in the Restitution Request materials submitted to this Court under seal, some of the victims depicted in the images and videos the Defendant distributed, viewed, and possessed are seeking restitution for costs associated with attending psychotherapy and/or counseling, medications, loss of income, loss of housing, and for various medical expenses. *See United States v. Monzel*, 930 F.3d at 486 (D.C. Cir. 2019) (noting that *Paroline*'s § 2259(b) restitution calculation is based on the defendant's "contribution to [the victim's] '*general* losses,'" and that the district court's calculation should be "a matter of 'discretion and sound judgment,'" considering the *entire totality* of the defendant's contributions, rather than a narrow, unnecessarily precise "exercise in long division") (emphasis added) (citing *Paroline*, 572 U.S. at 459-60)). The following victims in these known series of images have made restitution requests which have been submitted separately under

seal to the Court: Jenny, Aprilblonde, Lighthouse1, Jester, Tara, and SpongeB. For the reasons set forth above, the government respectfully requests that the Court order restitution in the amount of $24,000.00,[3] to be paid by the Defendant.

## V.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, each of these factors requires a lengthy sentence of incarceration within the sentencing guideline range. Based on these factors, the government respectfully requests that the Court impose a Guidelines sentence of 151 months' incarceration followed by a period of 10 years' supervised release.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:   */s/ Rachel Forman*
RACHEL FORMAN
VA Bar Number 89169
Assistant United States Attorney
U.S. Attorney's Office
601 D Street, NW
Washington, D.C.
Office: 202-252-6916
Rachel.forman2@usdoj.gov

---

[3] The government is awaiting a formal restitution request and supporting documentation from one additional victim at this time. The government will file those additional materials as soon as it receives them.